IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

FOUNDATION HEALTH SERVICES, INC.;
HUNTINGDON NURSING CENTER, INC. d/b/a
FRIENDLY NURSING HOME; RAVENWOOD
HEALTHCARE, INC. d/b/a HARBORSIDE NURSING
AND REHABILITATION CENTER f/k/a RAVENWOOD
NURSING AND REHABILITATION CENTER; ROCK
GLEN HEALTHCARE, INC. d/b/a ROCK GLEN NURSING
AND REHABILITATION CENTER; and RICHARD T.
DASPIT, SR.                                                                                      PLAINTIFFS

VS.                                                                                              CAUSE NO. 15-59

ZURICH AMERICAN INSURANCE COMPANY                                  DEFENDANT

## JOINT PETITION TO ENFORCE SUBPOENA

COMES NOW, Foundation Health Services, Inc., Huntingdon Nursing Center, Inc. d/b/a Friendly Nursing Home, Ravenwood Healthcare, Inc. d/b/a Harborside Nursing and Rehabilitation Center f/k/a Ravenwood Nursing and Rehabilitation Center, Rock Glen Healthcare, Inc. d/b/a Rock Glen Nursing and Rehabilitation Center, and Richard T. Daspit, Sr. ("Plaintiffs"), and Zurich American Insurance Company ("Defendant"), by and through counsel, and present this Petition to Enforce Subpoena as follows:

1. Both Plaintiffs and Defendant to this action request that this Court grant their Petition to Enforce Subpoena issued to Andrew S. Penn, an attorney with the United States Department of Justice, by the United States District Court for the Middle District of Louisiana.

2. This case concerns an insurance coverage dispute between Plaintiffs and Zurich. One of the central issues in the dispute between the parties in the United States District Court for the Middle District of Louisiana is whether a PowerPoint presentation made constituted a written demand for monetary damages within the meaning of an insurance policy at issue in the case. The PowerPoint is an important document for resolution of the case. On January 18, 2012, Penn,

Assistant United States Attorney, in conjunction with other enforcement agencies, made a PowerPoint presentation to Plaintiffs related to claims for worthless services under the False Claims Act.

3. On October 7, 2015, Zurich American Insurance Company served a Subpoena on Penn compelling his attendance at the deposition upon written questions and requiring production of the complete PowerPoint presentation. Ex. A, Subpoena.

4. In the deposition upon written questions, Penn asserted the work product privilege and objected to producing the complete PowerPoint presentation. Ex. B, Deposition Upon Written Questions. Both parties now seek production of the complete PowerPoint presentation and request that this Court enter an Order compelling Penn to produce the complete PowerPoint presentation.

5. The work-product privilege protects written materials lawyers prepare "in anticipation of litigation." Fed. R. Civ. P. 26(b)(3). The "testing question" for the work-product privilege, we have held, is " 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.' " *Senate of Puerto Rico v. U.S. Dep't of Justice,* 823 F.2d 574, 586 n. 42 (D.C.Cir.1987) (quoting 8 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2024 at 198 (1970)).

6. "By ensuring that lawyers can prepare for litigation without fear that opponents may obtain their private notes, memoranda, correspondence, and other written materials, the privilege protects the adversary process." *In re Sealed Case,* 146 F.3d 881, 884 (D.C. Cir. 1998) (citing *In re Sealed Case,* 107 F.3d 46, 51 (D.C. Cir. 1997) ("Like the attorney-client privilege, work product immunity promotes the rendering of effective legal services.")).

7. As a matter of law, however, "the protection 'derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived.'" *Feld v. Fireman's Fund Ins. Co.*, 991 F. Supp. 2d 242, 247 (D.D.C. 2013) (citing *United States v. Nobles,* 422 U.S. 225, 239, 95 S. Ct. 2160, 45 L.Ed.2d 141 (1975)). "[T]he work-product privilege is 'waived when the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege.'" Id. (citing *United States v. W. Elec. Co.,* 132 F.R.D. 1, 3 (D.D.C. 1990)). "As a general matter, the work-product doctrine will not be recognized when doing so 'is not required to maintain a healthy adversary system.'" *Id.* (citing *In re Sealed Case,* 676 F.2d 793, 818 (D.C. Cir. 1982).

8. The D.C. Circuit has identified three factors for considering whether the attorney work product privilege has been waived: "(1) the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege...; (2) appellants had no reasonable basis for believing that the disclosed materials would be kept confidential by the [third party]; and (3) waiver of the privilege in these circumstances would not trench on any policy elements now inherent in this privilege." *Navajo Nation v. Peabody Holding Co.,* 209 F. Supp. 2d 269, 286 (D.D.C. 2002), *aff'd,* 64 F. App'x 783 (D.C. Cir. 2003) (citing *In re Subpoenas Duces Tecum,* 738 F.2d at 1372 (internal citations omitted)).

9. Penn's and the United State of America's disclosure of the PowerPoint to the Plaintiffs was not consistent with the purpose of the adversary proceeding in that the disclosure was for the purpose of presenting the PowerPoint to the Plaintiffs, an adversary. Therefore, to the extent a work product privilege exists in the prior litigation between Plaintiffs and the federal government, any such objection by presenting the PowerPoint to Plaintiffs. Disclosure of a document protected by the work product doctrine waives the work product protection for that

document. *See In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 159 F.R.D. 307, 310 (D.D.C. 1994) (citing *Wichita Land & Cattle Co. v. Am. Fed. Bank*, 148 F.R.D. 456, 460–61 (D.D.C. 1992)).

10. In addition, the government had no reasonable basis to believe that the Plaintiffs would not communicate the substance of the PowerPoint. There was no confidentiality agreement, and no common litigant interests exist. The government permitted certain representatives of the Plaintiffs to take written notes. Finally, waiver of this privilege would not trench any policy elements inherent in the privilege. Not only did Penn disclose the PowerPoint through his presentation to Plaintiffs, but also despite his work product objection, Penn testified as to the PowerPoint's contents in his Deposition Upon Written Questions. Ex. B, Deposition Upon Written Questions.

11. Alternatively, assuming for the sake of argument that the PowerPoint is protected by the work product privilege, this Court should require Penn to produce the PowerPoint under Federal Rule of Civil Procedure 26(b)(3). The party seeking discovery must establish: 1) a "substantial need of the materials in the preparation of the party's case;" and 2) an inability "without undue hardship to obtain the substantial equivalent of the material by other means." Fed. R. Civ. P. 26(b)(3). In this case, both parties and the district court have substantial need for discovery of the PowerPoint presentation. The contents of the PowerPoint will facilitate the determination of whether the DOJ through the PowerPoint made a written monetary demand and ultimately whether a claim accrued under the insurance policy. There is also no way that either party can obtain the Powerpoint by other means. The DOJ is the only entity in possession of the PowerPoint.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs and Defendant Zurich respectfully request that this Court grant their Joint Petition to Enforce Subpoena and to order the United States Department of Justice, through Andrew Penn, to produce a complete copy of the PowerPoint presentation as requested in the subpoenas issued by the United States District Court for the Middle District of Louisiana.

This /4th day of July, 2016.

Respectfully submitted,

BY ATTORNEYS FOR

FOUNDATION HEALTH SERVICES, INC.; HUNTINGDON NURSING CENTER, INC. d/b/a FRIENDLY NURSING HOME; RAVENWOOD HEALTHCARE, INC. d/b/a HARBORSIDE NURSING AND REHABILITATION CENTER f/k/a RAVENWOOD NURSING AND REHABILITATION CENTER; and ROCK GLEN HEALTHCARE, INC. d/b/a ROCK GLEN NURSING AND REHABILITATION CENTER; and RICHARD T. DASPIT, SR.

/s/ Michael A. Heilman

Michael A. Heilman (DC Bar No. MS0003)
HEILMAN LAW GROUP, P.A.
4622 I-55 North, Suite 106
Jackson, Mississippi 39211
Telephone: (601) 914-1025
Facsimile: (601) 960-4200
E-mail: mheilman@heilmanlawgroup.com

William E. Steffes (LA Bar No. 12426)
STEFFES, VINGIELLO & McKENZIE, LLC
13702 Coursey Blvd., Building 3
Baton Rouge, Louisiana 70817
Telephone: (225) 751-1751
Facsimile: (225) 751-1998
E-mail: bsteffes@steffeslaw.com
*Attorneys for Plaintiffs*

and

Alexis J. Rogoski (NY Bar No. 2780930)
SKARZYNSKI BLACK, LLC
1 Battery Park Plaza, 32nd Floor
New York, New York 10004
Telephone:   (212) 820-7765
Facsimile:   (212) 820-7740
Email: arogoski@skarzynski.com
*Pro Hac Vice Admission*
*Attorney for Defendant*

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Middle District of Louisiana

| Foundation Health Services, Inc., et al. | ) |
|---|---|
| *Plaintiff* | ) |
| v. | ) Civil Action No. 3:15-cv-00059-JJB-SCR |
| Zurich American Insurance Company | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Andrew S. Penn

*(Name of person to whom this subpoena is directed)*

☑ **Testimony: YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See attached Notice of Deposition on Written Questions of Andrew S. Penn

| Place: Veritext, Inc.<br>1250 I Street, NW, Suite 1201<br>Washington, DC 20005 | Date and Time:<br>10/12/2015 9:30 am |
|---|---|

The deposition will be recorded by this method: Veritext Court Reporter

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: All documents referred to in Questions No. 6, 15, 19, 21, 23, 28, 31, 35 and 39 of the Notice of Deposition on Written Questions of Andrew S. Penn, attached.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/07/2015

CLERK OF COURT

_____   OR   _____
*Signature of Clerk or Deputy Clerk*                  *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Defendant, Zurich American Insurance Company , who issues or requests this subpoena, are:

Alexis J. Rogoski, Skarzynski Black LLC, One Battery Park Plaza, 32nd Floor, New York, N.Y. 10004 (212) 820-7765

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Exhibit A

## AFFIDAVIT OF PROCESS SERVER

United States District Court for the Middle District of Louisiana

Foundation Health Services, Inc., et al

Plaintiff(s),

vs.

Zurich American Insurance Company

Defendant(s).

Attorney: Alexis J. Rogoski, Esq.

Skarzynski Black LLC
One Battery Park Place, 32nd Floor
New York NY 10004

*97319*

Case Number: 3:15-CV-00059-JJB-SCR

Legal documents received by Veritext Legal Solutions (OH) on 10/07/2015 at 11:05 AM to be served upon Andrew S. Penn at U.S. Department of Justice, 601 D Street NW, Washington, DC 20579

I, Katherine Moore, swear and affirm that on October 07, 2015 at 3:55 PM, I did the following:

Served Andrew S. Penn by delivering a conformed copy of the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action; Notice of Deposition on Written Questions of Andrew S. Penn; Witness Fee Check in $41.25 to Mayra Giron as Legal Assistant & Authorized Agent of Andrew S. Penn at U.S. Department of Justice, 601 D Street NW, Washington, DC 20579.

Description of Person Accepting Service:
Sex: Female Age: 25 Height: Under 5' Weight: 131-160 lbs Skin Color: Brown Hair Color: Brown

Supplemental Data Appropriate to this Service:

I declare under penalty of perjury that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

Katherine Moore
Process Server

Veritext Legal Solutions (OH)
1100 Superior Avenue, Suite 1820
Cleveland OH 44114

216-621-9660

Internal Job ID: 97319

District of Columbia: SS
Subscribed and Sworn to before me
this ___ day of October ___
Castina Jewel Watson, Notary Public, D.C.
My commission expires August 31, 2020

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Page 1

```
 1              UNITED STATES DISTRICT COURT
                         FOR THE
 2               MIDDLE DISTRICT OF LOUISIANA
 3
 4   ------------------------X
     FOUNDATION HEALTH        )
 5   SERVICES, INC., et al    )
                              )
 6         Plaintiff,         )
                              )
 7         v.                 ) Civil Action No.
                              ) 3:15-CV-00059-JJB-SCR
 8   ZURICH AMERICAN          )
     INSURANCE COMPANY        )
 9                            )
           Defendant.         )
10   ------------------------X
11
12
13        Written Questions of ANDREW S. PENN
14                   Washington D C
15              Monday, December 7, 2015
16                    2:02 p.m.
17
18
19
20   Pages: 1 - 39
21   Reported by: Donna Marie Lewis, RPR, CSR
22
```

Exhibit B

Page 2

```
 1      UNITED STATES DISTRICT COURT
            FOR THE
 2      MIDDLE DISTRICT OF LOUISIANA
 3
 4   --------------------X
     FOUNDATION HEALTH    )
 5   SERVICES, INC., et al )
                          )
 6      Plaintiff,  )
                    )
 7      v.   ) Civil Action No.
             ) 3:15-CV-00059-JJB-SCR
 8   ZURICH AMERICAN     )
     INSURANCE COMPANY   )
 9                       )
        Defendant.   )
10   --------------------X
11
12
13       Deposition of ANDREW S. PENN, held at
14   Department of Justice, 601 D Street, NW,
15   Washington, D C 20004, pursuant to Notice, before
16   Donna Marie Lewis, Registered Professional
17   Reporter and Notary Public of and for the District
18   of Columbia.
19
20
21
22
```

Page 3

```
 1            APPEARANCES
 2
 3  ON BEHALF OF PLAINTIFF:
 4     HEILMAN LAW GROUP, P.A.
 5     4266 I-55 North
 6     Suite 106
 7     Jackson, MS 39211
 8
 9  ON BEHALF OF DEFENDANT:
10     SKARZYNSKI BLACK, LLC
11     One Battery Park Plaza, 32nd Floor
12     New York, NY 10004
13
14
15  ALSO PRESENT:
16     MAX WAGENBLAST, VIDEOGRAPHER
17
18
19
20
21
22
```

Page 4

```
 1              INDEX
 2  WITNESS:                        PAGE
 3    ANDREW S. PENN                 4
 4    Responds to Written Questions
 5
 6            EXHIBITS
              (Attached)
 7
 8  EXHIBITS:     DESCRIPTION           PAGE
 9  No. 1    January PowerPoint Presentation   5
10  No. 2    Letter dated 5/16/12 Attached to
             Notice                     5
11  No. 3    Email dated 5/21/12 with Analysis
             Attached                   5
12  No. 4    Settlement Agreement       5
13  No. 5    Corporate Integrity Agreement  5
14
15
16
17
18
19
20
21
22
```

Page 5

```
 1            P-R-O-C-E-E-D-I-N-G-S
 2       (Whereupon, Exhibits Nos. 1, 2, 3, 4,
 3   and 5 were marked for identification)
 4       THE VIDEOGRAPHER: We are now on the
 5   record. Please note that the microphones are
 6   sensitive and may pick up whispering and private
 7   conversations. Please turn off all cell phones
 8   and place them away from the microphone as they
 9   can interfere with the deposition or audio.
10   Recording will continue until all parties agree to
11   go off of the record. My name is Max Wagenblast,
12   representing Veritext. The date today is
13   December 7, 2015 and the time is approximately
14   2:04. This deposition is being held at the
15   Department of Justice located at 601 D Street,
16   Northwest, Washington, D C and being taken by
17   counsel for the defendant. The caption of this
18   case is Foundation Health Services, Inc. v Zurich
19   American Insurance Company. This case is being
20   held in the United States District for the Middle
21   District of Louisiana, Case number
22   3:15-CD-00059-JJV-SCR. The name of the witness is
```

2 (Pages 2 - 5)

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 6

1 Andrew Penn.
2 At this time the attorneys present in
3 the room and everyone attending remotely will
4 identify themselves and the parties that they
5 represent. There are no attorneys present at the
6 moment in the room. And the witness is reading
7 written questions. Our reporter, Donna Lewis,
8 representing Veritext will swear in the witness
9 and we can proceed.
10 Whereupon,
11     A N D R E W  S.  P E N N
12 after having been first duly sworn by the Notary
13 Public was examined and testified as follows:
14     THE VIDEOGRAPHER: You may proceed.
15     MR. PENN: Thank you. I'm going to read
16 the questions that were sent to me by defense
17 counsel and then I will answer them.
18     Question Number 1: Please state your
19 full name for the record.
20     Andrew Stuart Penn.
21     Question 2: What is your connection,
22 title, position and affiliation with the DOJ?

Page 7

1     I'm a trial attorney with the Department
2 of Justice, Civil Fraud Section.
3     What is your employment background?
4     I have been an attorney -- I've been an
5 attorney since 1977. I've worked at the Justice
6 Department since July 18, 2010. Before then I was
7 at the Bazelon Center for Mental Health Law for
8 about three years. Before that I was with the
9 United States Department of Health and Human
10 Services Office of Inspector General for about ten
11 years, from 1997 through 2007. Before then I was
12 with the Maryland Disability Law Center for 12
13 years. And that is about as far back as I care to
14 remember. And in all of those positions I was an
15 attorney.
16     My educational -- What is your
17 educational background.
18     I went to the University of Pennsylvania
19 undergraduate from 1970 to '74. I went to the
20 University of California Berkeley, School of Law
21 from 1974 to '77, graduated in '77. I did post
22 graduate work at the University of Maryland, got a

Page 8

1 Master's in history. And I don't recall when that
2 was. It was -- so that it is.
3     Question 5: Did you review any
4 documents in preparing the answers to these
5 questions?
6     Yes, I did.
7     If so, please identify the documents.
8     The documents I reviewed were those that
9 were sent to me as Exhibits 1 through 5 in this
10 deposition.
11     Number 7: Did you talk to anyone to
12 prepare the answers to this -- these questions?
13     Yes, I did. I talked to my co-counsel
14 in our case against Foundation and Kathy Pascale,
15 P-A-S-C-A-L-E.
16     Question 8: If so, please identify who
17 you talked to. I just answered that. And the
18 substance of that conversation.
19     I asked them essentially if their memory
20 of what I was going to answer was consistent with
21 mine. So I gave them the list of questions and
22 made sure that I was -- my recollection was

Page 9

1 correct.
2     Question 9: What was your role in
3 connection with the investigation commenced on or
4 about November 3, 2010 hereinafter "the
5 Investigation" by the DOJ and the HHS of potential
6 violations of the False Claims Act, 31 U.S.C. §
7 3729-3733 by Foundation.
8     Answer: I was one of the attorneys who
9 led the investigation.
10     Question number 10: Please describe the
11 conduct of Foundation being investigated in the
12 Investigation.
13     My answer is we were investigating
14 alleged billing for materially inefficient and
15 worthless services in violation of the False
16 Claims Act.
17     Question Number 11: Did you participate
18 in a meeting held January 18, 2012 at the U.S.
19 Attorney's Office in Baltimore, Maryland among
20 representatives of Foundation, DOJ and HHS.
21     Yes, I did.
22     Question 12: Who attended the meeting?

3 (Pages 6 - 9)

Page 10

1    Me, my co-company Kathy Pascale and Tom
2  Corcoran, our investigator in the case, Robert
3  Mosley, our nurse consultant Suzanne Passette
4  (phonetic), P-A-S-S-E-T-T-E, Richard Daspit, Sr.
5  from Foundation; his counsel, Julie Mitchell. And
6  other -- Michael Smith, who is also from
7  Foundation and he was COO. And other people from
8  Foundation whose names escape me at the moment.
9    Now we are at Question Number 14: Other
10 than subpoenas for documents and communications
11 concerning Foundation's compliance therewith, did
12 you or any other representatives or agents of the
13 DOJ or HHS send any written communication to
14 Foundation prior to January 18, 2012 meeting in
15 connection with the investigation?
16   Not that I recall.
17   Question Number 15: If so, please
18 identify those documents and produce them in
19 response to the attached subpoena?
20   Not applicable since I don't recall any
21 other documents.
22   Question 16: Did you participate in any

Page 11

1  meetings among representations of Foundation, the
2  DOJ and HHS prior to the January 18, 2012 meeting?
3    Not that I recall.
4    Question 17: If so, please identify
5  when and where those meetings took place and who
6  was in attendance and describe the discussions
7  that took place.
8    Not applicable since I can't recall any.
9    Number 18: If you did attend any such
10 meetings prior to the January 18, 2012 meeting,
11 did you take any notes of those meetings?
12   Again, that is not applicable because no
13 meetings took place.
14   Question 19: Please produce such notes
15 if any in response to the attached subpoena.
16   Again, that is not applicable.
17   Were any documents distributed to
18 Foundation at the January 18, 2012 meeting?
19   No, not that I recall.
20   Number 21: If so please identify those
21 documents and produce them in response to the
22 attached subpoena.

Page 12

1    Not applicable since I do not recall
2  giving them any documents.
3    Did you take any notes -- this is
4  question 22. Did you take any notes at the
5  January 18, 2012 meeting?
6    Yes, I did.
7    Question 23. Please produce such notes,
8  if any, in response to the attached subpoena.
9    I assert the work product -- that they
10 are protected by work product and I cannot produce
11 them.
12   Question 24: Please refer to the
13 document previously marked as Exhibit 5 in this
14 litigation. The January PowerPoint attached to
15 this notice.
16   I was -- this question asked for
17 Exhibit 5 but I got it from defense counsel and
18 they had marked it -- sent it to me as Exhibit 1.
19 And it is the first so we will -- that has been
20 marked by the court reporter as Exhibit 1.
21   Where was I? Okay. Is this document a
22 copy of the -- yes this is -- is this document a

Page 13

1  copy of the January PowerPoint presentation made
2  by DOJ to Foundation at the January 18th meeting?
3    This is a part of the PowerPoint. It is
4  not the complete PowerPoint. It is a group of
5  select slides that show documents that Foundation
6  produced to us pursuant to the subpoena. So we
7  were just giving them what they already had.
8    Turning to the last page of the exhibit,
9  they called it Exhibit 5, again this is Exhibit 1.
10 Does the Federal Express receipt indicate that you
11 sent a couple of this document to Julie Mitchell
12 on July -- January 26, 2012.
13   Yes.
14   Question Number 26: Were you involved
15 in preparing Exhibit 1? If so, please describe
16 your involvement?
17   I was involved in preparing Exhibit 1,
18 the PowerPoint presentation. It was a joint
19 effort among the people, both counsel and
20 investigators working on the case. And I -- we
21 chose the evidence to use in the PowerPoint and
22 any various drafts.

4 (Pages 10 - 13)

Page 14

1  Is this exhibit, again this is
2  Exhibit 1, a complete copy of the PowerPoint?
3       As I answered before the document is not
4  a complete, the complete PowerPoint. It is a
5  group of select slides that show documents
6  Foundation produced to us pursuant to the
7  subpoena.
8       If your answer is no, please produce a
9  copy of the complete -- this is Question Number
10 18, excuse me. If your answer is no, please
11 produce a copy of the complete PowerPoint in
12 response to the attach subpoenaed.
13      I object to producing it because it
14 contains work product.
15      Question Number 29: Please describe the
16 discussions that took place at the
17 January 18, 2012, meeting.
18      Essentially involved us narrating the
19 evidence that was on the slides and our position
20 of explaining the findings that we had come to to
21 date.
22      Question Number 30: Did the DOJ make a

Page 15

1  written demand for money, for monetary damages at
2  the January 18, 2012 meeting?
3       My answer is no.
4       Number 31: If your answer is yes to the
5  preceding question, please describe the demand for
6  monetary damages and produce a copy in response to
7  the attached subpoena.
8       Not applicable since my answer was no.
9       Do you agree that Exhibit 1, the
10 PowerPoint presentation, does not set forth a
11 demand for monetary damages?
12      This exhibit -- and my answer is the
13 exhibit, the PowerPoint does not set forth the
14 demand for monetary damages.
15      If your answer to the preceding -- this
16 is Number 33: If your answer to the preceding
17 question was anything other than an unqualified
18 yes, please explain the basis of your disagreement
19 with the question.
20      It is not applicable since I said I
21 agree that the PowerPoint does not set forth a
22 demand for monetary damages.

Page 16

1  Number 34: Did DOJ make a written
2  demand for monetary damages to Foundation as
3  concerning the matters that were subject of the
4  Investigation at any time prior to the
5  January 18, 2012 meeting?
6       My answer is no.
7       Question 35: If your answer to the
8  preceding question is yes, please describe
9  nature -- date, nature and details of any such
10 demand for monetary damages, produce a copy in
11 response to the attached subpoena.
12      This is not applicable since my answer
13 was no.
14      Thirty six, exhibit number -- Question
15 Number 36: Please refer to the document
16 previously marked as the Exhibit 2 in this
17 litigation. The questions have -- say Exhibit 11.
18 I just don't know where that is coming from. But
19 this is Exhibit 2, the May 16, 2012 letter
20 attached to the notice, to this notice and
21 identify the document.
22      As it says, as the question asked this

Page 17

1  is a letter that Tom Corcoran, my co-counsel, sent
2  to Julie Mitchell counsel for Foundation on
3  May 16, 2012.
4       Question Number 37: Were you involved
5  in preparing this document? If so, describe your
6  involvement.
7       I read a draft of it and made a few
8  suggestions for edits.
9       Now we move on to Question Number 38:
10 Did the DOJ send any written communications to
11 Foundation following Exhibit 1, the PowerPoint
12 presentation or prior to the May 16, 2012 letter
13 from DOJ to Foundation?
14      Not that I recall.
15      Number 39: If so, please identify such
16 documents and produce a copy in response to the
17 attached subpoena.
18      That is not applicable since I don't
19 recall any such communications.
20      Question Number 40: Please refer to the
21 first paragraph of section 3, page 3 of Exhibit 2.
22 And the first sentence which reads: We worked

Page 18

1  with both a nurse expert and CHSRA to make a
2  damages model that would measure the amount of
3  worthless services provided at the Foundation
4  facilities. What is meant by the phrase
5  "worthless services"?
6      Well, first my discussion with the
7  nurses, with our nurse consultant were protected
8  by attorney work product and I won't discuss them.
9  I can tell you that courts have defined worthless
10 services under the False Claims Act to mean
11 services that are so deficient that they are
12 equivalent of no services at the all.
13     Number 41: To your understanding, is a
14 claim for worthless services a recognized basis of
15 liability under the False Claims Act 31 U.S.C. §
16 3729.
17     Yes. My answer is yes.
18     Question 42: To your understanding has
19 the False Claim Act been interpreted as
20 prohibiting healthcare providers from submitting
21 reimbursement request to the federal government
22 for healthcare services that are so deficient that

Page 19

1  for all practical purposes they are the equivalent
2  of no performance at all and which are therefore
3  effectively false claims?
4      Yes, that is my understanding.
5      Question 43: Were you involved in the
6  determination review or calculation of monetary
7  damages to the United States and/or to the State
8  of Maryland estimated to have been caused by the
9  Foundation as set forth in Exhibit 2.
10     Yes.
11     Exhibit 44: If so, please describe your
12 involvement.
13     I was -- my answer is I was involved in
14 reviewing the calculations and determination.
15     Question 45: Please refer to section 3
16 of Exhibit 2. Is it correct that the calculation
17 of worthless services for these 36 residents in
18 the amount of $3,210,176 was based on the nurse
19 expert's review of 45 resident charts,
20 determination of the percentage of the admission
21 that was worthless for each of the 36 residents
22 where care was lacking and application of that

Page 20

1  percentage to the Medicaid and Medicare payments
2  of each of the 36 residents?
3      Yes. My answer is yes.
4      Forty six: Please refer to the portion
5  of section 3 of Exhibit 2 that discusses CHRSA's
6  finding, C-H-R-S-A. What is CHRSA?
7      C-H-R-S-A. CHRSA is an entity
8  affiliated with the University of Wisconsin in
9  Madison that seeks to improve long term care and
10 health systems by creating performance measures
11 and developing information and decision support
12 systems using data analysis.
13     Number 47: Please refer to Section III
14 of Exhibit 2 where it states that CHSRA had access
15 to all nursing facilities MDS data. What is MDS
16 data?
17     MDS is the -- stands for minimum
18 dataset. And it is a form that centers for mental
19 health -- the Centers for Medicare Services,
20 Medicare and Medicaid services require each
21 nursing facility to fill out for each resident of
22 a nursing home upon entering and quarterly

Page 21

1  thereafter and also at any time there has been a
2  change in resident condition. And the MDS lists
3  all kinds of questions related to information
4  about the residents health status, health and
5  functional status.
6      Question 48: Did CHSRA use MDS data and
7  the information developed by the nurse expert to
8  model or extrapolate the amount of worthless
9  services provided by (1) the Ravenswood, Rock Glen
10 and Friendly facilities and (2) Foundation as a
11 whole?
12     My answer is yes.
13     If so, describe the process used by
14 CHRSA to calculate such damages.
15     The most accurate way, effective way to
16 describe it, this is my answer is the way it is
17 described on page 4, paragraph 1 of the May 16th
18 letter, Exhibit 2.
19     Exhibit 50 -- no, Question 50: Please
20 refer to the documents previously marked as
21 Exhibit 3 in this litigation, the May 21, 2012
22 email and identify the document.

6 (Pages 18 - 21)

Page 22

1    It is a May 21, 2012 email from Tom --
2 Thomas Corcoran, the -- an assistant U S Attorney
3 on the case to Julie Mitchell, counsel for
4 Foundation and the subject is Foundation Health
5 Services letter and includes -- it attaches, well
6 it says, it pretty much speaks for itself as
7 requested is -- enclosed please find the analysis
8 that sets forth the percentage of worthless
9 services for the reviewed residents. Also
10 enclosed is the payment summary that sets forth
11 the amount actually paid by Medicaid and Medicare
12 to each of the nine Foundation facilities from
13 2006 to 2011. I forget what number that was,
14 question. Oh, okay. That was 47.
15    Question Number 48: Did CHSRA use MDA
16 data -- didn't I answer that. I did. Okay. That
17 is not -- actually we were on question 50.
18    Now I'm going to 51: Please refer to
19 Bates numbers FHS-610 to 611 of Exhibit 3. Okay.
20 Do these pages set forth DOJ's calculation of the
21 total Medicare and Medicaid payments to Foundation
22 for the 36 residents identified by the nurse

Page 23

1 expert as having received worthless services as
2 discussed in Section III of Exhibit 2?
3    Yes. That is my answer now that I've
4 found where we are.
5    Please refer to Bates number 612 to 616
6 of Exhibit 3. Do these pages reflect the nurse
7 expert's calculation of the per resident and total
8 payments to Foundation for worthless services
9 provided to the 36 residents identified by the
10 nurse expert as having received worthless services
11 as discussed in Section III of Exhibit 2?
12    The nurse consultant calculated the
13 percent of worthless services. CHSRA applied
14 those percentages to the 36 residents to calculate
15 the total single damages for each of those 36
16 residents. That is my answer.
17    53: Do you agree that the $3,210,176 in
18 damages calculated by the nurse consultant
19 represents the -- the nurse expert is what you
20 say, represents the most conservative approach to
21 damages suffered by the United States in the State
22 of Maryland?

Page 24

1    My answer is I have no opinion on that.
2 I know that this is the dollar amount calculated,
3 but I have no opinion as to whether it is the most
4 conservative.
5    Question Number 54: Do you agree the
6 measure of damages sought by DOJ was the amount of
7 the payments to Foundation for worthless services?
8    My answer is yes.
9    55: Please refer to the document
10 previously marked as Exhibit 4 in the settlement
11 agreement. Were you involved in preparing the
12 settlement agreement?
13    Yes I was is my answer.
14    And if so -- Question 57: If so,
15 describe your involvement in preparing this
16 document.
17    I believe I wrote the first draft and I
18 know I reviewed other drafts and edited them.
19    Exhibit -- I mean Question 58: Please
20 refer to paragraph 1 of Exhibit 4 which sets forth
21 the settlement amount of $750,000. Does the
22 $750,000 settlement amount reflect a compromise of

Page 25

1 the amount paid to Foundation for worthless
2 services?
3    My answer is yes.
4    Question 59: Please refer to paragraph
5 12 of Exhibit 4. Is it correct that this
6 provision precludes Foundation from charging the
7 United States or the State of Maryland for
8 unallowable costs as that term is defined in the
9 settlement agreement?
10    My answer is it speaks -- this paragraph
11 speaks for itself.
12    Question Number 60: Does the DOJ ever
13 agree to a settlement with the target of an
14 investigation that permits reimbursements of costs
15 incurred by the target in responding to the
16 investigation under 48 CFR 31.205-47(c) (I).
17    And my answer is, I don't know.
18    Question Number 61: If so, how
19 frequently does this occur? This is not -- this
20 question -- my answer is this question is not
21 applicable in light of the fact that I don't know
22 the answer to number 60.

7 (Pages 22 - 25)

Page 26

1  Question Number 62: (discussion off of
2  the record) If so, under what circumstances will
3  the DOJ agree to a settlement that permits the
4  target of an investigation to charge its costs of
5  responding to the investigation to the Medicare,
6  Medicaid TRICARE or FEHP Programs.
7      And my answer is, I don't know.
8      Please refer now -- Question Number 63:
9  Please refer to the documents previously marked as
10 Exhibit 5 in this litigation, the Corporate
11 Integrity Agreement attached to this notice and
12 identify the document.
13     It is the Corporate Integrity Agreement
14 signed by Foundation and Foundation's counsel and
15 others as well as by the HHS Office of Inspector
16 General.
17     Were you involved -- Question 64: Were
18 you involved in preparing Exhibit 14?
19     Yes.
20     Question 65: If so, please describe
21 your involvement.
22     I reviewed one or two drafts, a few

Page 27

1  drafts that HHS OIG wrote and asked for my
2  comment.
3      Number 66: Do the United States, DOJ
4  and HHS customarily require the target of an
5  investigation to enter such an agreement as part
6  of early settlement?
7      It is -- my answer is it is not
8  requirement.
9      If so, are there any -- Number 67: If
10 so, are there any exceptions and under what
11 circumstances would the United States, DOJ and HHS
12 enter a settlement without requiring an agreement
13 like the Corporate Integrity Agreement?
14     My answer is, it is not applicable
15 because of my previous answer said it is not a
16 requirement.
17     Now we are moving to Foundation's cross
18 examination of me.
19     Question Number 68: In the
20 January 18, 2012 meeting did the authorities make
21 an electronic written PowerPoint presentation to
22 Foundation?

Page 28

1  Yes.
2      Question Number 69: Was the case
3  against Foundation opened as a pending matter in
4  the DOJ when the authorities presented their
5  PowerPoint presentation to Foundation at the
6  January 18, 2012 meeting?
7      My answer is yes.
8      Did the United States Attorney's Office
9  have the power and approval of the authorities in
10 HHS to make the PowerPoint presentation to
11 Foundation at the meeting on January 18, 2012?
12     My answer is yes.
13     Question Number 71: Did the authorities
14 and HHS pursue resolution of the claims against
15 Foundation first by the written PowerPoint and
16 oral presentation through the January 18, 2012
17 meeting?
18     I have to -- I'm having a little trouble
19 understanding the question. I understand it.
20 Yes, my answer is yes.
21     Was the intention of the authorities,
22 this is Number 72: Was the intention of the

Page 29

1  authorities at the January 18, 2012 meeting to
2  notify Foundation through the PowerPoint and oral
3  presentation that the authorities intended to make
4  a False Claims Act claim for monetary damages and
5  other relief against Foundation and that
6  Foundation would have the option to respond in
7  settlement or have suit filed against them?
8      At the outset of the meeting, and I
9  believe again at the end of the meeting I told
10 Foundation that the purpose of the meeting was to
11 present our tentative findings and that we would
12 give them an opportunity to respond at a later
13 date with either contrary evidence or by opening
14 negotiations with us to try to settle.
15     Question Number 73: What was your role
16 in making the PowerPoint presentation to
17 Foundation?
18     I was presenter.
19     Question 74: During the
20 January 18, 2012 meeting did the authorities in
21 their PowerPoint presentation inform Foundation
22 that the claims against foundation were based at

8 (Pages 26 - 29)

| Page 30 | Page 32 |
|---|---|
| 1  least in part on violation of the federal and | 1  Foundation concerning this issue? |
| 2  Maryland False Claims Act. | 2       We said that monetary damages was one of |
| 3       Yes. | 3  the possible remedies. That is my answer. |
| 4       If not, what did the authorities inform | 4       During -- Question Number 79: During |
| 5  Foundation concerning this issue? | 5  the January 18, 2012 meeting did the authorities |
| 6       Not applicable. That is my answer. | 6  in their PowerPoint presentation inform Foundation |
| 7       Question 75: During the | 7  that the claims against Foundation involved |
| 8  January 18, 2012 meeting did the authorities in | 8  Foundation paying damaging for violation of the |
| 9  their PowerPoint presentation inform Foundation | 9  False Claims Act among other remedies? |
| 10 that the False Claims Act claims were based on the | 10      Yes. That is my answer. |
| 11 provision of worthless services? | 11      If not, what did the authorities inform |
| 12      Yes. That is my answer. | 12 Foundation concerning this issue? |
| 13      If not, what did the authorities inform | 13      Not applicable since I've answered yes. |
| 14 Foundation concerning this issue? | 14      Question 80: Please identify the |
| 15      Not applicable since I answered yes. | 15 amounts of money identified or set forth in the |
| 16      Question 76: During the January 18, | 16 PowerPoint presentation? |
| 17 2012 meeting did the authorities in the PowerPoint | 17      There were no amounts of money |
| 18 presentation present facts to Foundation that | 18 identified or set forth in the PowerPoint |
| 19 allegedly gave rise to the claims being made | 19 presentation. That is my answer. |
| 20 against Foundation? | 20      Question 88: Were the amounts of money |
| 21      Yes. That is my answer. | 21 set forth in the PowerPoint presentation based on |
| 22      If not, what did the authorities inform | 22 analysis from CHSRA which is identified in the |

| Page 31 | Page 33 |
|---|---|
| 1  Foundation concerning this issue? | 1  May 16, 2012 letter, Exhibit 2? |
| 2       Not applicable since I already answered | 2       My answer to that is no because no |
| 3  yes. | 3  amounts of money were set forth at the |
| 4       Question 77: The May 16, 2012 letter | 4  January 12th meeting. |
| 5  previously marked as Exhibit 2 in this litigation | 5       Number 82: Did the authorities |
| 6  states, "As we indicated during our meeting in | 6  generally agree -- generally -- excuse me. Did |
| 7  January any resolution of this case would include | 7  the authorities generally attempt to settle claims |
| 8  a monetary settlement for worthless services." Is | 8  under the False Claims Act prior the bringing |
| 9  the meeting referred to in this letter the | 9  suit? |
| 10 January 18, 2012 meeting? | 10      My answer is that is my general |
| 11      My answer is yes. | 11 practice. |
| 12      If not, what was the new reference to? | 12      Number 83: Under what authority do the |
| 13      Not applicable. | 13 authorities first present written claims against |
| 14      Question Number 78: During the | 14 alleged defendants under the False Claims Act as |
| 15 January 18th meeting did the authorities -- 2012 | 15 in the case of Foundation in an effort to reach |
| 16 meeting, did the authorities in their PowerPoint | 16 monetary settlements in lieu of first filing suit |
| 17 presentation identify or set forth any amounts of | 17 under the False Claims Act? |
| 18 money used or to be used as the basis for a | 18      I'm unaware of any such formal |
| 19 monetary demand by the United States against | 19 authority. |
| 20 Foundation? | 20      Number 84: During the January 18, 2012 |
| 21      No is my answer. | 21 meeting did the authorities in their PowerPoint |
| 22      If not, what did the authorities inform | 22 presentation inform Foundation that the |

Page 34

1 authorities would pursue legal claims for monetary
2 damages against Foundation if Foundation did not
3 reach a monetary settlement for False Claims Act
4 violations alleged against them?
5      Not that I recall.
6      If not, what did the authorities inform
7 Foundation concerning this issue?
8      To the best of my recollection we
9 informed foundation that we had serious concerns
10 based on our findings to date and that we might
11 pursue legal claims for False Claims Act damages
12 but that we hadn't reached a final decision yet.
13      85: Did the Department of Justice's
14 commercial litigation branch refer the case
15 against Foundation to the United States Attorney's
16 Office?
17      My answer is yes.
18      If so, under what authority did the
19 Department of Justice's Commercial Litigation
20 Branch, Civil Division refer this case to the
21 United States Attorney's Office.
22      And my answer is I don't know. I do

Page 35

1 know it is done. I have done it.
2      Question Number 86: After the
3 January 18, 2012 meeting, did Foundation and the
4 authorities engage in negotiations to settle the
5 authorities claims against Foundation?
6      My answer is yes.
7      Number 87: Did the authorities and/or
8 HHS provide Foundation a deadline to decide
9 whether to engage in settlement negotiations after
10 the January 18, 2012 meeting?
11      My answer is not that I recall though I
12 do recall us contacting them often to check on the
13 status.
14      Question -- and then it goes on to ask,
15 if so what deadline was provided?
16      Again none was provided that I'm aware
17 of, that I recall at least.
18      Question Number 88: Did any
19 representative of Zurich American Insurance
20 Company ever communicate with you regarding the
21 claims of the authorities against Foundation?
22      My answer is yes. They communicated

Page 36

1 with me about arranging for this deposition.
2      Question 89: During the
3 January 18, 2012 meeting did the authorities
4 and/or HHS in their PowerPoint presentation inform
5 Foundation that a settlement of the False Claims
6 Act claims would involve a Corporate Integrity
7 Agreement?
8      My answer to that is a Corporate
9 Integrity Agreement was one of the remedies listed
10 on the PowerPoint as possible remedies?
11      Question 90: This is Question 90:
12 Foundation's questions number 71 and 72 refer to
13 both the written PowerPoint and oral presentation
14 at the January 18, 2012 meeting. To the extent
15 your response to those questions was based on both
16 written PowerPoint and oral presentation, please
17 distinguish and describe what portion of your
18 response was based on the written PowerPoint and
19 what portion of your response was based on the
20 oral presentation?
21      My answer is it was based on both. I
22 discussed the purpose of the meeting in oral --

Page 37

1 both in oral introduction and at and the end.
2      Question Number 91: Foundation's
3 question Number 77 references the May 16th letter
4 previously marked as Exhibit 2 and includes the
5 following quote, "As we indicated during our
6 meeting in January, any resolution of this case
7 would include a monetary settlement for worthless
8 services. Was the referenced statement based on
9 the written PowerPoint or the oral discussions
10 with Foundation at the January meeting?
11      It was both, I believe.
12      Question Number 92: Foundation's
13 question Number 81 refers to damages analysis from
14 the Center For Health Systems Research and
15 Analysis, HSRA, which is identified in the
16 May 16, 2012 letter previously marked as
17 Exhibit 2. When did CHSRA complete the analysis
18 included in the May 16, 2012 letter?
19      I don't know. My answer is I don't know
20 the exact date but I believe it was some time
21 between -- I'm pretty sure it was sometime between
22 the January 2012 meeting and the May 16th letter.

10 (Pages 34 - 37)

Page 38

1    Number 93: When did the nursing
2 consultant complete the calculation of damages for
3 the 36 patients in the amount of $3,210,165
4 identified in the May 16, 2012 letter previously
5 marked as Exhibit 2?
6    My answer is I don't know the exact date
7 but I believe it was sometime between the
8 January 2012 meeting and the May 16, 2012 letter.
9    Number 94, the last question. I'm very
10 happy to see it: Did the DOJ ever commence an
11 administrative proceeding within the meaning of 31
12 U.S.C.A § 3730(c)(5), a copy of which is attached
13 hereto against Foundation. And if so, when was
14 that proceeding commenced?
15    My answer is no. I never got the
16 attachment to it. And that is the last of the
17 questions that were sent to me.
18    THE VIDEOGRAPHER: Going off of the
19 record. The time is 14:47.
20    (Whereupon, at 2:47 p.m., the above
21 proceedings was adjourned.)
22

Page 39

1    REPORTER'S CERTIFICATE
2    I, DONNA M. LEWIS, RPR, Certified
3 Shorthand Reporter before whom the foregoing
4 deposition was taken, do hereby certify that the
5 foregoing transcript is a true and correct record
6 of the testimony; that said testimony was taken by
7 me stenographically and thereafter reduced to
8 typewriting under my direction; that review was
9 not requested; and that I am neither counsel for,
10 related to, nor employed by any of the parties to
11 this case and have no interest, financial or
12 otherwise, in its outcome.
13    IN WITNESS WHEREOF, I have hereunto set
14 my hand and affixed my notarial seal this 10th day
15 of December, 2015.
16
17    *Donna M Lewis*
18
19 My commission expires: March 14, 2018
20
21
22